**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 1, 2024**

# In the Court of Appeals of Georgia

A24A0126. McCLOUD v. THE STATE.

McFADDEN, Presiding Judge.

On February 6, 2019, three-week-old A. M. was hospitalized with numerous, serious acute and healing injuries, including multiple fractures. Medical experts determined that the infant had sustained non-accidental blunt force trauma over a period of time, and the state jointly charged his parents, both individually and as parties to a crime, with several counts of family-violence aggravated battery (OCGA § 16-5-24) and cruelty to children in the first degree (OCGA § 16-5-70).

This appeal concerns the convictions of A. M.'s father, Jarrett McCloud, for those crimes. McCloud argues that the trial court erred in denying his motion for directed verdict, because the evidence of his guilt was circumstantial and did not

exclude the reasonable hypothesis that another person, such as A. M.'s mother, injured the infant. We hold, however, that the evidence was sufficient to support McCloud's convictions.

McCloud also argues that the trial court erred in permitting evidence of his marijuana use on the day A. M. was taken to the hospital, but we hold that the evidence was admissible as intrinsic to the charged offenses. He argues that the trial court erred in failing to grant him a mistrial sua sponte in response to purported misconduct by the jurors and the bailiff, but we hold that he has not preserved those claims of error for appellate review. Finally, he argues that his trial counsel rendered constitutionally ineffective assistance in failing to request a mistrial both in response to the juror and bailiff issues and in response to the state's allegedly improper closing argument, but we hold that he has not met his burden of showing both deficient performance and prejudice.

So we affirm.

1. *Directed verdict*

We review the trial court's denial of McCloud's motion for a directed verdict under the same standard as that used "for determining the sufficiency of the evidence

to support a conviction. Under that standard, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Shelton v. State*, 313 Ga. 161, 168 (2) (869 SE2d 377) (2022) (citations and punctuation omitted). (Some of the evidence discussed below is the trial testimony of A. M.'s mother, Megan Richmond, who was indicted with McCloud. Whether she was McCloud's accomplice, such that her testimony would require corroboration to establish a fact in this case, was a question for the jury, which was instructed on that issue. See *Caldwell v. State*, 313 Ga. 640, 643 (1) (872 SE2d 712) (2022).)

So viewed, the evidence showed that A. M. was born on January 14, 2019, and was discharged from the hospital two days later. At that time, he had no physical injuries.

From January 16 to January 25, A. M. and his mother, Richmond, stayed with McCloud in a room within a small mobile home that McCloud shared with other family members. McCloud was one of the infant's caregivers and on at least one occasion during this time period A. M. was in his sole care. A. M. had some visible scratches and other abrasions on his body during this time period. He also cried a lot

and showed signs of discomfort whenever his body was moved or manipulated, such as when his clothes were being changed. Richmond discussed some of these issues with A. M.'s pediatrician and on January 21 searched the internet for "why [her] baby's eye [was] swollen." McCloud did not attend any of A. M.'s pediatrician appointments.

Between January 25 and January 31, 2019, A. M. and Richmond visited Richmond's parents. McCloud did not accompany them and had no contact with A. M. during those days. A. M. did not display any new injuries during the visit.

On January 31, 2019, A. M. and Richmond returned to the room in the mobile home that they shared with McCloud, and McCloud again had access to the infant. The next day, Richmond noticed bruises on the infant's face. A. M. also sustained a cut near his eye while he was in McCloud's sole care. A photograph of A. M. taken on February 3 showed the infant with a noticeable cut under his eye and bruises on his face. McCloud told Richmond that the injuries were normal and that the infant had inflicted them on himself. Richmond continued to have concerns about A. M.'s physical condition and sought answers from her parents, from a friend, and through

4

internet searches on issues such as the presence of blood in a baby's stool and why a baby's joints popped.

On February 5, 2019, McCloud yanked A. M. out of Richmond's arms during an argument. Upset, Richmond walked out of the room, leaving the infant in McCloud's care for a bit. Later Richmond noticed that one of A. M.'s legs was badly swollen and larger than his other leg. During the night, she tried to discover the cause by conducting internet searches such as "why is my baby's thigh swollen?" and sending her close friend a picture of A. M.'s leg. Richmond told McCloud that she thought A. M. needed medical attention, but McCloud disagreed and the two got into an argument about it. McCloud refused to let Richmond leave the room with A. M., stating that the infant had a blood clot that could be addressed by massaging the swollen leg.

The next morning, February 6, 2019, another resident of the mobile home stated that she would call 911 if Richmond did not seek medical care for A. M., and later that day, Richmond and McCloud's mother took A. M. to the hospital. McCloud did not go with them, having stated that "it was a bad idea" and that "DFCS would get involved and take [A. M.] away."

5

When A. M. arrived at the hospital on February 6, 2019, he had significant injuries. Many of the injuries were immediately visible, including severe bruising, several scratches, and dried blood on his face; bruising and discoloration on numerous other parts of his body; his eye injury; and his badly swollen leg. Initial scans revealed that A. M. also had several fractures, including a broken leg.

Suspecting child abuse, hospital personnel immediately notified law enforcement and took custody of A. M. Law enforcement asked McCloud to come to the hospital, and when he arrived McCloud appeared to be under the influence and stated that he had been smoking marijuana.

A. M. was transferred to a specialized children's hospital, where additional observation, scans, and other testing revealed that he had numerous serious injuries, including blunt force trauma to his "diaper area"; trauma to his brain, tissues, and abdomen; and various fractures. Some of his injuries, including a fracture to his right clavicle, were in the process of healing, meaning that they had occurred sometime between his birth and January 28. Other injuries were acute and had not yet begun to heal, meaning that they had occurred sometime between January 24 and February 6, when A. M. was hospitalized. Still other injuries could not be dated.

A doctor who examined A. M. at the children's hospital and who was an expert in child abuse pediatrics opined that the infant's injuries were non-accidental trauma, meaning that they had been intentionally inflicted upon him. Some, such as the leg injury, were caused by significant force. The doctor testified that A. M.'s right femur (or upper leg) was "significantly displaced," meaning "the bone was literally bent," and his right tibia and fibula (or lower leg) had a type of fracture caused by "forceful yanking, twisting, or shearing." Those fractures would have occurred shortly before A. M.'s leg started swelling. The doctor testified that the infant could not have inflicted the injuries on himself, and the injuries would not have occurred in a single incident.

McCloud argues that he was entitled to a directed verdict because this evidence was insufficient to support his convictions. Because the trial court merged several of the convictions for sentencing, we consider only the convictions for which McCloud was sentenced. See *Rivera v. State*, 317 Ga. 398, 405 (1) (893 SE2d 696) (2023); *McIntyre v. State*, 312 Ga. 531, 534 (1) n. 5 (863 SE2d 166) (2021). Those convictions are for family-violence aggravated battery for injuring A. M.'s right clavicle between January 16 and January 25 (Count 1); first-degree child cruelty for causing fractures

7

to A. M. between January 16 and January 25 (Count 15); and first-degree child cruelty for causing multiple injuries to A. M., including fractures, bruises, and scratches, between January 31 and February 6 (Count 17).

McCloud argues that there was only circumstantial evidence that he was the person who injured A. M. and that the evidence did not exclude the reasonable hypothesis that another person, such as Richmond, inflicted the injuries. Although we agree that there is only circumstantial evidence of McCloud's guilt, the evidence nevertheless authorized his convictions.

As an initial matter, we do not address whether the circumstantial evidence authorized McCloud's convictions on a theory that he was a party to the crimes, because even though the state charged McCloud both individually and as a party to the crimes, the trial court instructed the jury that "the party-to-a-crime doctrine [did] not apply to this case." (We discuss that instruction in more detail below, in connection with one of McCloud's claims for ineffective assistance of counsel.) We note, however, that our Supreme Court has recently held that where a young child sustained fatal injuries while in the exclusive care of her mother and her mother's boyfriend, and the defendant boyfriend downplayed and failed to account for those

injuries, the circumstantial evidence was sufficient to show either that he personally injured the child or that he was a party to inflicting those injuries. *Payne v. State*, 318 Ga. 249, 252-254 (2) (897 SE2d 809) (2024).

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But

> not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, [an appellate court] will not disturb that finding unless it is unsupportable as a matter of law.

*Hamilton v. State*, 309 Ga. 1, 6 (2) (843 SE2d 840) (2020) (citation and punctuation omitted). Accord *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences derived from the facts. Likewise, we allow the jury to decide whether the defense theory was reasonable and not

9

excluded by the other evidence." *Butler v. State*, 310 Ga. 892, 895 (1) (855 SE2d 551) (2021) (citations and punctuation omitted).

The jury could infer from the circumstantial evidence presented at trial that between January 16 and January 25, McCloud caused the broken clavicle and other fractures alleged in Counts 1 and 15, and that between January 31 and February 6, McCloud caused the fractures, bruises, and scratches alleged in Count 17. That evidence included: (1) expert opinion testimony that A. M. could have sustained the injuries during periods in which he was in McCloud's care; (2) expert opinion testimony that the injuries "were the result of non-accidental, significant force generated by multiple blows[,]" *Rashad v. State*, 318 Ga. 199, 207 (2) (897 SE2d 760) (2024); (3) evidence that A. M.'s serious leg injury became apparent soon after McCloud yanked him from Richmond's arms and then spent time alone with him; (4) evidence that the large scratch under A. M.'s eye occurred while he was in McCloud's sole care; (5) evidence that McCloud downplayed or offered unreasonable explanations for the injuries, such as that A. M. had injured himself; (5) evidence that McCloud displayed a nonchalant, indifferent attitude about his health, especially when the infant was in obvious need of immediate medical attention; and (6) evidence that

McCloud displayed callousness toward A. M. in other ways, such as referring to the infant as "it" or as an "obnoxious motherfucker," cussing at the infant, and telling the infant to "shut the fuck up." See *Rashad*, supra (evidence that the defendant had physically hurt the child victim on an earlier occasion supported the finding that the defendant was the person who later murdered the child); *Moore v. State*, 314 Ga. 351, 354-355 (877 SE2d 174) (2022) (evidence that the defendant downplayed a child's injuries and displayed "apparent indifference" to and a nonchalant attitude about the child's general health and condition after being injured supported a finding of sufficient circumstantial evidence of the defendant's role in the child's death); *Scott v. State*, 307 Ga. 37, 40 (1) (a) (834 SE2d 88) (2019) (finding evidence sufficient to support defendant's conviction for felony murder of a child where there was expert testimony that the injuries sustained by the child while in the care of the defendant were non-accidental). Cf. *Payne*, 318 Ga. at 254 (2) (evidence that the defendant downplayed the injuries of a child in his care and "failed to account for the extensive damage to [the child's] body" supported a finding that the defendant was guilty of crimes related to the child's death, either by inflicting the injuries himself or as a party to the crime).

11

McCloud argues that this evidence did not exclude other reasonable hypotheses. He asserts that A. M.'s injuries could have occurred during the time when A. M. and Richmond were staying with Richmond's parents and McCloud did not have access to the infant. And he asserts that no matter when the injuries occurred, Richmond or someone else could have been responsible.

But the evidence authorized the jury to reject these hypotheses. For example, there was evidence that while A. M. was staying with Richmond and her parents he did not sustain any additional injuries, but once he returned to McCloud's residence he incurred new and significant injuries, such as facial bruises, the cut to his eye, and the damage to his leg. And there was evidence that Richmond, unlike McCloud, was puzzled and concerned by the injuries; she researched potential causes, asked others for advice, pushed for A. M. to get medical care, and sought updates from hospital personnel.

"Accordingly, the jury was not required to conclude that the hypothes[es] proposed by [McCloud were] reasonable." *Hamilton*, 309 Ga. at 6 (2) (citation and punctuation omitted). Instead, to the extent there was evidence questioning the timing or cause of A. M.'s injuries, "the jury was entitled to discredit [that evidence] and

find that [McCloud] inflicted the . . . injur[ies alleged in Counts 1, 15, and 17] during the window[s] of time in which the medical experts estimated the blunt-force trauma occurred." *Moore*, 314 Ga. at 354-355.

2. *Evidence of marijuana use*

McCloud argues that the trial court erred by allowing the introduction of evidence of his marijuana use. In a ruling on a motion in limine, the trial court permitted such evidence but limited it to evidence about McCloud's appearance and statements at the hospital. The state introduced[1] the evidence through a hospital security officer, who testified that when McCloud arrived at the hospital he appeared to be under the influence of marijuana and that he admitted having smoked marijuana because "he was nervous. . . . Just what all was going on with [A. M.] He was nervous about everything."

McCloud contends that this was improper character evidence that should have been excluded under OCGA § 24-4-404 (b). But the trial court held that it was

---

[1] Under questioning from McCloud's counsel, a friend of McCloud also testified that McCloud sometimes used marijuana. To the extent McCloud also complains that the jury heard his friend's testimony, that claim has no merit because the testimony was elicited by his counsel. See *Adkins v. State*, 301 Ga. 153, 154-157 (2) (800 SE2d 341) (2017).

admissible as intrinsic evidence, which our Supreme Court has held is "outside the reach of Rule 404 (b)" even if it incidentally puts the defendant's character at issue. *Smith v. State*, 307 Ga. 263, 272 (2) (c) (834 SE2d 1) (2019) (citation and punctuation omitted). We review this ruling for abuse of discretion, see *Abbott v. State*, 311 Ga. 478, 482 (2) (858 SE2d 696) (2021), and find no error.

"'Intrinsic evidence' is defined as evidence that (1) pertains to an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably intertwined with the evidence regarding the charged offense." *Abbott*, 311 Ga. at 482 (2). "In assessing whether evidence is necessary in this context, [our Supreme Court has] noted that 'necessary' is not used in a strictly literal sense, but rather, refers to what evidence is reasonably necessary for the [s]tate to complete the story of the crime." *Jennings v. State*, ___ Ga. ___ (1) (___ SE2d ___) (Case No. S24A0095, decided Mar. 5, 2024) (citation and punctuation omitted). Evidence that advances the state's theory of the case can be "necessary to complete the story of the crime for the jury. . . ." *Harris v. State*, 310 Ga. 372, 379 (2) (b) (850 SE2d 77) (2020) (citation and punctuation omitted). If it is relevant to the defendant's guilt on the charged crimes,

it is intrinsic. See *Wilson v. State*, 315 Ga. 728, 740 (8) (a) n. 4 (883 SE2d 802) (2023); see also *Roberts v. State*, 315 Ga. 229, 236 (2) (a) (880 SE2d 501) (2022) (citing *United States v. Battle*, 774 F3d 504, 511 (II) (8th Cir. 2014), for the proposition that "[w]hen evidence of other crimes tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged and is not extrinsic") (citation and punctuation omitted). This is so even if the evidence concerns the defendant's use of illicit drugs. See *Smith v. State*, 302 Ga. 717, 725-726 (4) (808 SE2d 661) (2017).

The state's case against McCloud rested in part on the theory that McCloud had a nonchalant attitude about A. M.'s well-being and medical care. As discussed above, McCloud's attitude towards the infant was relevant to the question of whether McCloud was the person who injured him. See *Moore*, 314 Ga. at 355. His attitude also was relevant to one of the child-cruelty charges, which alleged his failure to seek timely medical care for the infant. (That charge merged with another child-cruelty count for sentencing.)

McCloud's decision to smoke marijuana instead of accompanying his badly injured infant to the hospital was part of a larger body of evidence that addressed this

theory of the case. The state presented evidence that McCloud did not attend A. M.'s pediatrician appointments and that he attempted to convince Richmond not to seek medical care for the infant's obvious leg injury. The state presented opinion testimony from A. M.'s examining physician, who was also an expert in child abuse pediatrics, that McCloud's appearance at the hospital under the influence of marijuana after earlier choosing not to go to the hospital with the infant was "significant" in assessing the risk of child abuse. The state elicited similar testimony from a licensed clinical social worker, who stated that in assessing the risk of child abuse, it was "clinically concerning" for McCloud to choose to smoke marijuana rather than to accompany A. M. to the hospital.

Under these circumstances, the trial court did not abuse his discretion in determining that the evidence of McCloud's marijuana use — which, as noted above, the trial court limited to McCloud's appearance and statements at the hospital — was intrinsic to the charges against him. See *Johnson v. State*, 312 Ga. 481, 491-492 (4) (863 SE2d 137) (2021) (holding that evidence of the defendant's involvement in uncharged shootings was intrinsic to the charged crime of criminal gang activity because the evidence was probative of the state's theory that the defendant was

involved in other shootings as part of his gang "work", and so it was reasonably necessary to complete the story of the charged crime); *Smith*, 307 Ga. at 271-272 (2) (c) (holding that evidence that the defendant and another person had been seen using and possibly selling drugs on the street corner where a shooting occurred was intrinsic to the charged crimes connected with that shooting because the evidence advanced the state's theory that the shooting was the culmination of a series of drug-related robberies). See also *Roberts*, 315 Ga. at 236-237 (2) (b) (limited evidence of an uncharged crime may be admissible as intrinsic even if evidence of the crime as a whole is not intrinsic).

Cases cited by McCloud that concern evidence of drug use by a *victim* rather than a defendant — such as *Gill v. State*, 296 Ga. 351 (765 SE2d 925) (2014) and *Crowe v. State*, 277 Ga. 513 (591 SE2d 829) (2004) — are inapposite, because the admissibility of evidence implicating a victim's character is subject to a different analysis. See *White v. State*, 307 Ga. 882, 885 (2) (838 SE2d 828) (2020) ("Admissibility of evidence of a victim's character is now governed by OCGA §§ 24-4-404 (a) (2) and 24-4-405 (a), which generally limit evidence of a victim's character to reputation or opinion and not specific bad acts.").)

17

"Because th[e] evidence was intrinsic to the crimes charged, it was [not] barred by Rule 404 (b). . . . And although the evidence may have incidentally placed [McCloud's] character at issue, its probative value was not substantially outweighed by the danger of unfair prejudice under these circumstances." *Williams v. State*, 302 Ga. 474, 487 (IV) (d) (807 SE2d 350) (2017). See *Johnson*, 312 Ga. at 491 (4) ("the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that trial courts should grant only sparingly") (citation and punctuation omitted).

3. *Juror and bailiff issues*

During the state's case-in-chief the courtroom bailiff informed the trial court that he had seen notes on the jury room's chalkboard (also referred to in the record as a whiteboard). The notes suggested to the bailiff that the jurors were already discussing the case. The bailiff stated that he told the jurors to erase the notes and informed them that they could not discuss the case until the trial court instructed them to do so. The trial court then gave the jurors an instruction, agreed to by the prosecutor and McCloud's counsel, that they could not begin deliberating until the court told them to do so after the close of the evidence, and that until such time they must keep their notes to themselves and not discuss the case with each other.

In two enumerations of error, McCloud argues that the trial court should have declared a mistrial sua sponte because the jury had improperly engaged in deliberations before the close of the evidence and because the bailiff, by telling the jury to erase their notes, "had caused the destruction of evidence of juror misconduct without any direction from the court or parties."

These claims of error are not subject to our review. McCloud did not preserve them for ordinary appellate review because he "did not raise any objection below to the trial court's handling of [this] issue." *Clark v. State*, 315 Ga. 1, 5 (2) (b) (880 SE2d 201) (2022) (concerning alleged juror misconduct). See also *Hill-Blount v. State*, 339 Ga. App. 92, 94 (1) (793 SE2d 436) (2016) (concerning alleged improper communication between bailiff and juror). And McCloud is not entitled to plain-error review, which

> is limited to the sentencing phase of a trial resulting in the death penalty, a trial judge's expression of opinion in violation of OCGA § 17-8-57, . . . a jury charge affecting substantial rights of the parties as provided under OCGA § 17-8-58 (b), and, for cases tried after January 1, 2013, . . . rulings on evidence . . . affecting substantial rights [as provided under] OCGA § 24-1-103 (d).

*Keller v. State*, 308 Ga. 492, 497 (2) (a) (842 SE2d 22) (2020) (citation and punctuation omitted). See *Clark*, supra (declining to apply plain-error review to a claim "that the trial court should have sua sponte conducted its own investigation into [a] juror's alleged [misconduct]" rather than simply reminding the jurors to avoid contact with persons outside the jury).

4. *Ineffective assistance of counsel*

McCloud argues that his trial counsel rendered ineffective assistance for failing to request a mistrial (1) in response to the juror and bailiff issues discussed above and (2) when the state made an allegedly improper closing argument. To prevail on this claim, McCloud

> must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. To prove that the performance of his lawyer was deficient, [McCloud] must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. And to prove that he was prejudiced by the performance of his lawyer, [McCloud] must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This burden is a heavy one.

*Simpson v. State*, 298 Ga. 314, 318 (4) (781 SE2d 762) (2016) (citations and punctuation omitted). As detailed below, McCloud has not met this burden.

(a) *Failure to seek a mistrial in response to the juror and bailiff issues*

McCloud argues that his trial counsel was ineffective for "failing to move for a mistrial when it was discovered that jurors had been improperly deliberating prior to the close of the state's evidence and that the bailiff in this case had destroyed evidence of this deliberation making the ability to ascertain details of this improper conduct impossible." Instead, trial counsel expressly waived any objection and agreed to a curative instruction. McCloud has not shown that his trial counsel performed deficiently.

McCloud argues that his trial counsel should have moved for a mistrial because the chalkboard notes seen by the bailiff indicated improper jury deliberations, the extent of which could not be determined because the notes had been erased. In his order on McCloud's motion for new trial, the trial court appears to have concluded that the jury did, in fact, engage in premature discussions about the case. Nevertheless, the trial court found that trial counsel had not performed deficiently in failing to request a mistrial, citing trial counsel's testimony at the motion-for-new-trial

21

hearing that he thought the case was going well for McCloud; that, in his experience, a retrial of a case usually was "worse for the defense the second time"; and that he believed proceeding with the trial would be in McCloud's best interest.

McCloud has not shown that no reasonable lawyer would have made a similar decision. See *McClendon v. State*, 299 Ga. 611, 614-615 (2) (791 SE2d 69) (2016) (finding no merit in appellant's claim that his trial counsel was ineffective for failing to ask for a mistrial after co-defendant's counsel commented on appellant's right to remain silent; trial counsel had testified that he did not want to risk a less effective second cross-examination of the state's key witness on retrial, and appellant did not show that no reasonable counsel would have failed to move for a mistrial under the circumstances). Although he argues that it was the state's burden "to disprove the prejudicial nature of any deliberations or discussion," he cites no authority for this proposition in support of his argument that his trial counsel performed deficiently by not asking for a mistrial. And we are not persuaded that the authorities he cites in support of his separate claims that the trial court should have declared a mistrial sua sponte require a finding of ineffective assistance of counsel. Those authorities address presumptions of harm when jurors engage in irregular conduct and bailiffs engage in

22

improper jury communication. See, e. g., *Lockridge v. State*, 260 Ga. 528, 529-530 (397 SE2d 695) (1990); *Battle v. State*, 234 Ga. 637, 638 (217 SE2d 255) (1975). They do not address the reasonableness of an attorney's decision to not seek a mistrial despite the possible occurrence of irregular or improper conduct.

Consequently, McCloud did not show that his trial counsel performed deficiently for failing to seek a mistrial in response to the juror and bailiff issues.

(b) *Failure to seek a mistrial in response to the state's closing argument*

During closing argument, the prosecutor told the jurors that the trial court would "instruct [them] regarding parties to a crime[,]" and then began to explain that concept, stating: "A person can be committed [sic] for a crime to which they are a party. A person is a party to a crime even if he does not directly commit the crime. If he intentionally helps in the commission of a crime, or if he intentionally advises –." At that point McCloud's counsel objected on the ground that the state had not requested a parties-to-a-crime jury charge, and the trial court then gave the jury the following curative instruction: "Ladies and gentlemen, just prior to your break, counsel for the state argued that a person can be held responsible for a crime, even if they did not commit the crime, if they were a party to it. You are to disregard

23

counsel's statements because the party-to-a-crime doctrine does not apply to this case." McCloud's trial counsel appears to have drafted that instruction and did not object to the trial court giving it in response to his objection.

McCloud argues that this constituted ineffective assistance by his trial counsel. Instead, McCloud asserts, his trial counsel should have requested a mistrial under OCGA § 17-8-75, which permits a trial court to either give a curative instruction or grant a mistrial when a prosecuting attorney "make[s] statements of prejudicial matters which are not in evidence[.]"

Whether to grant a mistrial, either under OCGA § 17-8-75 or for another reason, is a matter within the trial court's discretion. *Harper v. State*, 318 Ga. 185, 194 (2) (897 SE2d 818) (2024); *Samuels v. State*, 335 Ga. App. 819, 824 (2) (783 SE2d 344) (2016). And McCloud has not shown that the trial court was required to grant a mistrial in this case. To the contrary, although the state does not argue the point, it is not apparent to us that OCGA § 17-8-75 applies to an objection about a legal concept raised in closing argument. See *Elliott v. State*, 275 Ga. App. 359, 362 (2) (620 SE2d 584) (2005) (OCGA § 17-8-75 "concerns the introduction of *facts* not in evidence") (emphasis supplied).

Nor is it apparent to us that there was anything else objectionable about the prosecution's closing argument. As discussed above, the state indicted McCloud both individually and as a party to a crime. And notwithstanding the trial court's curative instruction that the party-to-a-crime doctrine did not apply in this case, the trial court later charged the jury on aspects of that doctrine. The trial court charged the jury that "[k]nowledge on the part of the defendant that the crimes of aggravated battery and cruelty to children in the first degree were being committed and that the defendant knowingly and intentionally *participated or helped in the commission of such crime* must be proved by the state beyond a reasonable doubt." (Emphasis supplied.) The trial court also charged the jury that "should you find, beyond a reasonable doubt, that the defendant had knowledge that the crime was being committed and that the defendant knowingly and intentionally *participated or helped in the commission of it*, then you would be authorized to convict the defendant." (Emphasis supplied.) And the trial court charged the jury:

> [T]he accused's presence at the scene of a crime, even when coupled with knowledge and approval of the act, not amounting to encouragement, is not sufficient to show that the accused is *a party to the crime*. In order to find that the accused was *a party to the crime*, it is

necessary that there be proof that the accused shared a common criminal intent to commit the crime with the actual perpetrator.

(Emphasis supplied.) See generally OCGA § 16-2-20 (a) ("[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime[,]"); OCGA § 16-2-20 (b) (3), (4) ("[a] person is concerned in the commission of a crime[, among other ways,] if he . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime").

Trial counsel is "not deficient in failing to pursue a meritless course of action." *Tyson v. State*, 312 Ga. 585, 602 (6) (f) (864 SE2d 44) (2021). Here, McCloud's trial counsel was able to obtain a favorable curative instruction in response to an objection of questionable merit on a matter within the trial court's discretion. Under such circumstances, McCloud

has not carried his burden of showing that his trial counsel performed deficiently by failing [instead] to move for a mistrial. . . . Because the trial court would have acted within [his] discretion in denying a motion for mistrial, the failure of [McCloud's] trial counsel to make a motion that the trial court was authorized to deny does not establish ineffective assistance by that counsel.

*Vallejo v. State*, 362 Ga. App. 33, 42 (3) (a) (865 SE2d 640) (2021). See *Hill v. State*, 310 Ga. 180, 189-190 (6) (850 SE2d 110) (2020) (defendant did not show that trial counsel was deficient for failing to ask for a mistrial in response to the presentation of bad character evidence, where the trial court would have been authorized to deny such a motion and the trial court had, on the defendant's objection, given a curative instruction).

*Judgment affirmed. Mercier, C. J., and Rickman, J., concur.*